199 A.2d 548 (1964)
P. T. CHEFF, Katharine N. Cheff, Edgar P. Landwehr, Defendants Below, Appellants,
v.
Anne J. MATHES and Harry Lewis, Plaintiffs Below, Appellees,
v.
Robert H. TRENKAMP, George Spatta, Ralph C. Boalt, John D. Ames, Motor Products Corporation and Holland Furnace Company, Defendants Below.
Robert H. TRENKAMP, Defendant Below, Appellant,
v.
Anne J. MATHES and Harry Lewis, Plaintiffs Below, Appellees, and
Holland Furnace Company, Defendant Below, Appellee.
Supreme Court of Delaware.
March 17, 1964.
*549 James M. Tunnell, Jr., and David A. Drexler, of Morris, Nichols, Arsht & Tunnell, Wilmington (Hathaway, Latimer, Clink & Robb, Muskegon, Mich., of counsel), for P. T. Cheff, Katharine N. Cheff and Edgar P. Landwehr.
David F. Anderson and Richard L. McMahon, of Berl, Potter & Anderson, Wilmington (Robert H. Trenkamp and Malcolm C. Douglas, Trenkamp & Bovington, Cleveland, Ohio, of counsel), for Robert H. Trenkamp.
Irving Morris, of Cohen & Morris, Wilmington (Charles Trynin, New York City, of counsel), for Holland Furnace Co.
William E. Taylor, Jr., Wilmington, Sidney L. Garwin, New York City (Samuel M. Koenigsberg, Newark, N. J., of counsel), for Anne J. Mathes and Harry Lewis.
TERRY, C. J., and WOLCOTT and CAREY, JJ., sitting.
CAREY, Justice.
This is an appeal from the decision of the Vice-Chancellor in a derivative suit holding certain directors of Holland Furnace Company liable for loss allegedly resulting *550 from improper use of corporate funds to purchase shares of the company. Because a meaningful decision upon review turns upon a complete understanding of the factual background, a somewhat detailed summary of the evidence is required.
Holland Furnace Company, a corporation of the State of Delaware, manufactures warm air furnaces, air conditioning equipment, and other home heating equipment. At the time of the relevant transactions, the board of directors was composed of the seven individual defendants. Mr. Cheff had been Holland's Chief Executive Officer since 1933, received an annual salary of $77,400, and personally owned 6,000 shares of the company. He was also a director. Mrs. Cheff, the wife of Mr. Cheff, was a daughter of the founder of Holland and had served as a director since 1922. She personally owned 5,804 shares of Holland and owned 47.9 percent of Hazelbank United Interest, Inc. Hazelbank is an investment vehicle for Mrs. Cheff and members of the Cheff-Landwehr family group, which owned 164,950 shares of the 883,585 outstanding shares of Holland. As a director, Mrs. Cheff received a compensation of $200.00 for each monthly board meeting, whether or not she attended the meeting.
The third director, Edgar P. Landwehr, is the nephew of Mrs. Cheff and personally owned 24,010 shares of Holland and 8.6 percent of the outstanding shares of Hazelbank. He received no compensation from Holland other than the monthly director's fee.
Robert H. Trenkamp is an attorney who first represented Holland in 1946. In May 1953, he became a director of Holland and acted as general counsel for the company. During the period in question, he received no retainer from the company, but did receive substantial sums for legal services rendered the company. Apart from the above-described payments, he received no compensation from Holland other than the monthly director's fee. He owned 200 shares of Holland Furnace stock. Although he owned no shares of Hazelbank, at the time relevant to this controversy, he was serving as a director and counsel of Hazelbank.
John D. Ames was then a partner in the Chicago investment firm of Bacon, Whipple & Co. and joined the board at the request of Mr. Cheff. During the periods in question, his stock ownership varied between ownership of no shares to ownership of 300 shares. He was considered by the other members of the Holland board to be the financial advisor to the board. He received no compensation from Holland other than the normal director's fee.
Mr. Ralph G. Boalt was the Vice President of J. R. Watkins Company, a manufacturer and distributor of cosmetics. In 1953, at the request of Mr. Cheff, he became a member of the board of directors. Apart from the normal director's fee, he received no compensation from Holland for his services.
Mr. George Spatta was the President of Clark Equipment Company, a large manufacturer of earth moving equipment. In 1951, at the request of Mr. Cheff, he joined the board of directors of Holland. Apart from the normal director's fee, he received no compensation from the company.
The board of directors of Hazelbank included the five principal shareholders: Mrs. Cheff; Leona Kolb, who was Mrs. Cheff's daughter; Mr. Landwehr; Mrs. Bowles, who was Mr. Landwehr's sister; Mrs. Putnam, who was also Mr. Landwehr's sister; Mr. Trenkamp; and Mr. William DeLong, an accountant.
Prior to the events in question, Holland employed approximately 8500 persons and maintained 400 branch sales offices located in 43 states. The volume of sales had declined from over $41,000,000 in 1948 to less than $32,000,000 in 1956. Defendants contend that the decline in earnings is attributable to the artificial post-war demand generated in the 1946-1948 period. In order to stabilize the condition of the *551 company, the sales department apparently was reorganized and certain unprofitable branch offices were closed. By 1957 this reorganization had been completed and the management was convinced that the changes were manifesting beneficial results. The practice of the company was to directly employ the retail salesman, and the management considered that practice  unique in the furnace business  to be a vital factor in the company's success.
During the first five months of 1957, the monthly trading volume of Holland's stock on the New York Stock Exchange ranged between 10,300 shares to 24,200 shares. In the last week of June 1957, however, the trading increased to 37,800 shares, with a corresponding increase in the market price. In June of 1957, Mr. Cheff met with Mr. Arnold H. Maremont, who was President of Maremont Automotive Products, Inc. and Chairman of the boards of Motor Products Corporation and Allied Paper Corporation. Mr. Cheff testified, on deposition, that Maremont generally inquired about the feasibility of merger between Motor Products and Holland. Mr. Cheff testified that, in view of the difference in sales practices between the two companies, he informed Mr. Maremont that a merger did not seem feasible. In reply, Mr. Maremont stated that, in the light of Mr. Cheff's decision, he had no further interest in Holland nor did he wish to buy any of the stock of Holland.
None of the members of the board apparently connected the interest of Mr. Maremont with the increased activity of Holland stock. However, Mr. Trenkamp and Mr. Staal, the Treasurer of Holland, unsuccessfully made an informal investigation in order to ascertain the identity of the purchaser or purchasers. The mystery was resolved, however, when Maremont called Ames in July of 1957 to inform the latter that Maremont then owned 55,000 shares of Holland stock. At this juncture, no requests for change in corporate policy were made, and Maremont made no demand to be made a member of the board of Holland.
Ames reported the above information to the board at its July 30, 1957 meeting. Because of the position now occupied by Maremont, the board elected to investigate the financial and business history of Maremont and corporations controlled by him Apart from the documentary evidence produced by this investigation, which will be considered infra, Staal testified, on deposition, that "leading bank officials" had indicated that Maremont "had been a participant, or had attempted to be, in the liquidation of a number of companies." Staal specifically mentioned only one individual giving such advice, the Vice President of the First National Bank of Chicago. Mr. Cheff testified, at trial, of Maremont's alleged participation in liquidation activities. Mr. Cheff testified that: "Throughout the whole of the Kalamazoo-Battle Creek area, and Detroit too, where I spent considerable time, he is well known and not highly regarded by any stretch." This information was communicated to the board.
On August 23, 1957, at the request of Maremont, a meeting was held between Mr. Maremont and Cheff. At this meeting, Cheff was informed that Motor Products then owned approximately 100,000 shares of Holland stock. Maremont then made a demand that he be named to the board of directors, but Cheff refused to consider it. Since considerable controversy has been generated by Maremont's alleged threat to liquidate the company or substantially alter the sales force of Holland, we believe it desirable to set forth the testimony of Cheff on this point: "Now we have 8500 men, direct employees, so the problem is entirely different. He indicated immediately that he had no interest in that type of distribution, that he didn't think it was modern, that he felt furnaces could be sold as he sold mufflers, through half a dozen salesmen in a wholesale way."
Testimony was introduced by the defendants tending to show that substantial unrest *552 was present among the employees of Holland as a result of the threat of Maremont to seek control of Holland. Thus, Mr. Cheff testified that the field organization was considering leaving in large numbers because of a fear of the consequences of a Maremont acquisition; he further testified that approximately "25 of our key men" were lost as the result of the unrest engendered by the Maremont proposal. Staal, corroborating Cheff's version, stated that a number of branch managers approached him for reassurances that Maremont was not going to be allowed to successfully gain control. Moreover, at approximately this time, the company was furnished with a Dun and Bradstreet report, which indicated the practice of Maremont to achieve quick profits by sales or liquidations of companies acquired by him. The defendants were also supplied with an income statement of Motor Products, Inc., showing a loss of $336,121.00 for the period in 1957.
On August 30, 1957, the board was informed by Cheff of Maremont's demand to be placed upon the board and of Maremont's belief that the retail sales organization of Holland was obsolete. The board was also informed of the results of the investigation by Cheff and Staal. Predicated upon this information, the board authorized the purchase of company stock on the market with corporate funds, ostensibly for use in a stock option plan.
Subsequent to this meeting, substantial numbers of shares were purchased and, in addition, Mrs. Cheff made alternate personal purchases of Holland stock. As a result of purchases by Maremont, Holland and Mrs. Cheff, the market price rose. On September 13, 1957, Maremont wrote to each of the directors of Holland and requested a broad engineering survey to be made for the benefit of all stockholders. During September, Motor Products released its annual report, which indicated that the investment in Holland was a "special situation" as opposed to the normal policy of placing the funds of Motor Products into "an active company". On September 4th, Maremont proposed to sell his current holdings of Holland to the corporation for $14.00 a share. However, because of delay in responding to this offer, Maremont withdrew the offer. At this time, Mrs. Cheff was obviously quite concerned over the prospect of a Maremont acquisition, and had stated her willingness to expend her personal resources to prevent it.
On September 30, 1957, Motor Products Corporation, by letter to Mrs. Bowles, made a buy-sell offer to Hazelbank. At the Hazelbank meeting of October 3, 1957, Mrs. Bowles presented the letter to the board. The board took no action, but referred the proposal to its finance committee. Although Mrs. Bowles and Mrs. Putnam were opposed to any acquisition of Holland stock by Hazelbank, Mr. Landwehr conceded that a majority of the board were in favor of the purchase. Despite this fact, the finance committee elected to refer the offer to the Holland board on the grounds that it was the primary concern of Holland.
Thereafter, Mr. Trenkamp arranged for a meeting with Maremont, which occurred on October 14-15, 1957, in Chicago. Prior to this meeting, Trenkamp was aware of the intentions of Hazelbank and Mrs. Cheff to purchase all or portions of the stock then owned by Motor Products if Holland did not so act. As a result of the meeting, there was a tentative agreement on the part of Motor Products to sell its 155,000 shares at $14.40 per share. On October 23, 1957, at a special meeting of the Holland board, the purchase was considered. All directors, except Spatta, were present. The dangers allegedly posed by Maremont were again reviewed by the board. Trenkamp and Mrs. Cheff agree that the latter informed the board that either she or Hazelbank would purchase part or all of the block of Holland stock owned by Motor Products if the Holland board did not so act. The board was also informed that in order for the corporation to finance the purchase, substantial sums would have to be borrowed from commercial lending institutions. A *553 resolution authorizing the purchase of 155,000 shares from Motor Products was adopted by the board.[1] The price paid was in excess of the market price prevailing at the time, and the book value of the stock was approximately $20.00 as compared to approximately $14.00 for the net quick asset value. The transaction was subsequently consummated. The stock option plan mentioned in the minutes has never been implemented. In 1959, Holland stock reached a high of $15.25 a share.
On February 6, 1958, plaintiffs, owners of 60 shares of Holland stock, filed a derivative suit in the court below naming all of the individual directors of Holland, Holland itself and Motor Products Corporation as defendants. The complaint alleged that all of the purchases of stock by Holland in 1957 were for the purpose of insuring the perpetuation of control by the incumbent directors. The complaint requested that the transaction between Motor Products and Holland be rescinded and, secondly, that the individual defendants account to Holland for the alleged damages. Since Motor Products was never served with process, the initial remedy became inapplicable. Ames was never served nor did he enter an appearance.
After trial, the Vice Chancellor found the following facts: (a) Holland directly sells to retail consumers by means of numerous branch offices. There were no intermediate dealers. (b) Immediately prior to the complained-of transactions, the sales and earnings of Holland had declined and its marketing practices were under investigation by the Federal Trade Commission. (c) Mr. Cheff and Trenkamp had received substantial sums as Chief Executive and attorney of the company, respectively. (d) Maremont, on August 23rd, 1957, demanded a place on the board. (e) At the October 14th meeting between Trenkamp, Staal and Maremont, Trenkamp and Staal were authorized to speak for Hazelbank and Mrs. Cheff as well as Holland. Only Mr. Cheff, Mrs. Cheff, Mr. Landwehr, and Mr. Trenkamp clearly understood, prior to the October 23rd meeting, that either Hazelbank or Mrs. Cheff would have utilized their funds to purchase the Holland stock if Holland had not acted. (g) There was no real threat posed by Maremont and no substantial evidence of intention by Maremont to liquidate Holland. (h) Any employee unrest could have been caused by factors other than Maremont's intrusion and "only one important employee was shown to have left, and his motive for leaving is not clear." (1) The Court rejected the stock option plan as a meaningful rationale for the purchase from Maremont or the prior open market purchases.
The Court then found that the actual purpose behind the purchase was the desire to perpetuate control, but because of its finding that only the four above-named directors knew of the "alternative", the remaining directors were exonerated. No appeal was taken by plaintiffs from that decision.
An examination of the record indicates that a substantial portion of the evidence presented to the Vice Chancellor consisted of deposition testimony and documentary evidence. The only individuals who testified personally (aside from a financial expert) were Mr. Cheff, Trenkamp and Staal. Depositions of the other directors were introduced, but no deposition was taken from Maremont. The standard of review governing this court in such cases was established in Blish v. Thompson Automatic Arms Corp., 30 Del.Ch. 538, 64 A.2d 581, wherein we stated:
"* * * regardless of the state of the evidence below, if there be sufficient oral testimony in the record to support the findings of fact below, such findings should not be disturbed by this Court." (30 Del.Ch. at page 604, 64 A.2d at page 604).
*554 Under the provisions of 8 Del.C. § 160, a corporation is granted statutory power to purchase and sell shares of its own stock. Such a right, as embodied in the statute, has long been recognized in this State. See In re International Radiator Co., 10 Del.Ch. 358, 92 A. 255. The charge here is not one of violation of statute, but the allegation is that the true motives behind such purchases were improperly centered upon perpetuation of control. In an analogous field, courts have sustained the use of proxy funds to inform stockholders of management's views upon the policy questions inherent in an election to a board of directors, but have not sanctioned the use of corporate funds to advance the selfish desires of directors to perpetuate themselves in office. See Hall v. Trans-Lux Daylight Picture Screen Corp., 20 Del.Ch. 78, 171 A. 226. Similarly, if the actions of the board were motivated by a sincere belief that the buying out of the dissident stockholder was necessary to maintain what the board believed to be proper business practices, the board will not be held liable for such decision, even though hindsight indicates the decision was not the wisest course. See Kors v. Carey, Del.Ch., 158 A. 2d 136. On the other hand, if the board has acted solely or primarily because of the desire to perpetuate themselves in office, the use of corporate funds for such purposes is improper. See Bennett v. Propp, Del., 187 A.2d 405, and Yasik v. Wachtel, 25 Del.Ch. 247, 17 A.2d 309.
Our first problem is the allocation of the burden of proof to show the presence or lack of good faith on the part of the board in authorizing the purchase of shares. Initially, the decision of the board of directors in authorizing a purchase was presumed to be in good faith and could be overturned only by a conclusive showing by plaintiffs of fraud or other misconduct. See Bankers Securities Corp. v. Kresge Department Stores, Inc., D.C., 54 F.Supp. 378. In Kors, cited supra, the court merely indicated that the directors are presumed to act in good faith and the burden of proof to show to the contrary falls upon the plaintiff. However, in Bennett v. Propp, supra, we stated:
"We must bear in mind the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult. * * * Hence, in our opinion, the burden should be on the directors to justify such a purchase as one primarily in the corporate interest." (187 A.2d 409, at page 409).[2]
The case of Martin v. American Potash and Chemical Corp., 33 Del.Ch. 234, 92 A.2d 295, 35 A.L.R.2d 1140, relied upon by defendants to support their contention that the burden of proof should be on plaintiffs, is inapposite. As noted in Bennett, Martin was concerned with a statutory reduction of capital, which has the additional safeguards of notice to stockholders and shareholder approval.
To say that the burden of proof is upon the defendants is not to indicate, however, that the directors have the same "selfdealing interest" as is present, for example, when a director sells property to the corporation. The only clear pecuniary interest shown on the record was held by Mr. Cheff, as an executive of the corporation, and Trenkamp, as its attorney. The mere fact that some of the other directors were substantial shareholders does not create a personal pecuniary interest in the decisions made by the board of directors, since all shareholders would presumably share the benefit flowing to the substantial shareholder. See Smith v. Good Music Station, Inc., 36 Del.Ch. 262, 129 A.2d 242. Accordingly, these directors other than Trenkamp and Cheff, while called upon to justify their *555 actions, will not be held to the same standard of proof required of those directors having personal and pecuniary interest in the transaction.
As noted above, the Vice Chancellor found that the stock option plan, mentioned in the minutes as a justification for the purchases, was not a motivating reason for the purchases. This finding we accept, since there is evidence to support it; in fact, Trenkamp admitted that the stock option plan was not the motivating reason. The minutes of October 23, 1957 dealing with the purchase from Maremont do not, in fact, mention the option plan as a reason for the purchase. While the minutes of the October 1, 1957 meeting only indicated the stock option plan as the motivating reason, the defendants are not bound by such statements and may supplement the minutes by oral testimony to show that the motivating reason was genuine fear of an acquisition by Maremont. See Bennett v. Propp, cited supra.
Plaintiffs urge that the sale price was unfair in view of the fact that the price was in excess of that prevailing on the open market. However, as conceded by all parties, a substantial block of stock will normally sell at a higher price than that prevailing on the open market, the increment being attributable to a "control premium". Plaintiffs argue that it is inappropriate to require the defendant corporation to pay a control premium, since control it meaningless to an acquisition by a corporation of its own shares. However, it is elementary that a holder of a substantial number of shares would expect to receive the control premium as part of his selling price, and if the corporation desired to obtain the stock, it is unreasonable to expect that the corporation could avoid paying what any other purchaser would be required to pay for the stock. In any event, the financial expert produced by defendant at trial indicated that the price paid was fair and there was no rebuttal. Ames, the financial man on the board, was strongly of the opinion that the purchase was a good deal for the corporation. The Vice Chancellor made no finding as to the fairness of the price other than to indicate the obvious fact that the market price was increasing as a result of open market purchases by Maremont, Mrs. Cheff and Holland.
The question then presented is whether or not defendants satisfied the burden of proof of showing reasonable grounds to believe a danger to corporate policy and effectiveness existed by the presence of the Maremont stock ownership. It is important to remember that the directors satisfy their burden by showing good faith and reasonable investigation; the directors will not be penalized for an honest mistake of judgment, if the judgment appeared reasonable at the time the decision was made. See Karasik v. Pacific Eastern Corp., 21 Del.Ch. 81, 180 A. 604.
In holding that employee unrest could as well be attributed to a condition of Holland's business affairs as to the possibility of Maremont's intrusion, the Vice Chancellor must have had in mind one or both of two matters: (1) the pending proceedings before the Federal Trade Commission concerning certain sales practices of Holland; (2) the decrease in sales and profits during the preceding several years. Any other possible reason would be pure speculation. In the first place, the adverse decision of the F.T.C. was not announced until after the complained-of transaction. Secondly, the evidence clearly shows that the downward trend of sales and profits had reversed itself, presumably because of the reorganization which had then been completed. Thirdly, everyone who testified on the point said that the unrest was due to the possible threat presented by Maremont's purchases of stock. There was, in fact, no testimony whatever of any connection between the unrest and either the F.T.C. proceedings or the business picture.
*556 The Vice Chancellor found that there was no substantial evidence of a liquidation posed by Maremont. This holding overlooks an important contention. The fear of the defendants, according to their testimony, was not limited to the possibility of liquidation; it included the alternate possibility of a material change in Holland's sales policies, which the board considered vital to its future success. The unrebutted testimony before the court indicated: (1) Maremont had deceived Cheff as to his original intentions, since his open market purchases were contemporaneous with his disclaimer of interest in Holland; (2) Maremont had given Cheff some reason to believe that he intended to eliminate the retail sales force of Holland; (3) Maremont demanded a place on the board; (4) Maremont substantially increased his purchases after having been refused a place on the board; (5) the directors had good reason to believe that unrest among key employees had been engendered by the Maremont threat; (6) the board had received advice from Dun and Bradstreet indicating the past liquidation or quick sale activities of Motor Products; (7) the board had received professional advice from the firm of Merril Lynch, Fenner & Beane, who recommended that the purchase from Motor Products be carried out; (8) the board had received competent advice that the corporation was over-capitalized; (9) Staal and Cheff had made informal personal investigations from contacts in the business and financial community and had reported to the board of the alleged poor reputation of Maremont. The board was within its rights in relying upon that investigation, since 8 Del.C. § 141 (f) allows the directors to reasonably rely upon a report provided by corporate officers. See Graham v. Allis-Chalmers Manufacturing Co., Del., 188 A.2d 125.
Accordingly, we are of the opinion that the evidence presented in the court below leads inevitably to the conclusion that the board of directors, based upon direct investigation, receipt of professional advice, and personal observations of the contradictory action of Maremont and his explanation of corporate purpose, believed, with justification, that there was a reasonable threat to the continued existence of Holland, or at least existence in its present form, by the plan of Maremont to continue building up his stock holdings. We find no evidence in the record sufficient to justify a contrary conclusion. The opinion of the Vice Chancellor that employee unrest may have been engendered by other factors or that the board had no grounds to suspect Maremont is not supported in any manner by the evidence.
As noted above, the Vice-Chancellor found that the purpose of the acquisition was the improper desire to maintain control, but, at the same time, he exonerated those individual directors whom he believed to be unaware of the possibility of using non-corporate funds to accomplish this purpose. Such a decision is inconsistent with his finding that the motive was improper, within the rule enunciated in Bennett. If the actions were in fact improper because of a desire to maintain control, then the presence or absence of a non-corporate alternative is irrelevant, as corporate funds may not be used to advance an improper purpose even if there is no non-corporate alternative available. Conversely, if the actions were proper because of a decision by the board made in good faith that the corporate interest was served thereby, they are not rendered improper by the fact that some individual directors were willing to advance personal funds if the corporation did not. It is conceivable that the Vice Chancellor considered this feature of the case to be of significance because of his apparent belief that any excess corporate funds should have been used to finance a subsidiary corporation. That action would not have solved the problem of Holland's over-capitalization. In any event, this question was a matter of business judgment, which furnishes no justification for holding *557 the directors personally responsible in this case.
Accordingly, the judgment of the court below is reversed and remanded with instruction to enter judgment for the defendants.
NOTES
[1] Spatta agreed by telephone.
[2] See also Andersen v. Albert and J. M. Anderson Manufacturing Co., 325 Mass. 343, 90 N.E. 2d 541.