CRANE CO., Plaintiff,

v.

HARSCO CORPORATION and Richard S. Gebelein, the Attorney General of the State of Delaware, Defendants,

and

HARSCO CORPORATION, Counterclaim Plaintiff,

v.

Thomas M. EVANS and Crane Co., Counterclaim Defendants.

Civ. A. No. 81–30.

United States District Court, D. Delaware.

March 12, 1981.

On Motion For Reargument March 13, 1981.

R. Franklin Balotti, Donald A. Bussard and Samuel A. Nolen of Richard, Layton & Finger, Wilmington, Del., for plaintiff Crane Co.; Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel.

Rodman Ward, Jr., Stuart L. Shapiro, Stephen P. Lamb and James G. Wiles of Skadden, Arps, Slate, Meagher & Flom, Michael D. Goldman, David B. Brown and Donald J. Wolfe, Jr., of Potter, Anderson & Corroon, Wilmington, Del., for defendant Harsco Corp.; Mudge, Rose, Guthrie & Alexander, New York City, of counsel.

### OPINION

CALEB M. WRIGHT, Senior District Judge.

On January 27, 1981 Crane Company ("Crane") commenced a tender offer for approximately 15% of the stock of Harsco Corporation ("Harsco"). This Court denied Harsco's motion to enjoin consummation of this hostile tender offer for alleged violations of federal securities and antitrust laws on February 17, 1981. The tender offer was to have expired on February 25, 1981, but has twice been extended. Crane has now moved for a preliminary injunction to prevent Harsco from completing purchase of 132,300 shares of its common stock from arbitrageurs, and from making any further such purchases during the pendency of this action. Crane argues that Harsco's purchase of its own stock would violate federal securities and Delaware common law. This Court granted a temporary restraining order against Harsco on February 27, but following a hearing on March 3, denied the injunctive relief in an Order issued March 4. This Opinion sets forth the Court's Findings of Fact and Conclusions of Law supporting the denial, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### I. *Factual Background*

The facts concerning the commencement of the tender offer are set out in the Court's earlier opinion in this case. *See Crane Co. v. Harsco Corp.*, 509 F.Supp. 115 (D.Del.1981). The Court finds the following facts concerning the events which set the stage for this action.

As the original expiration date of Crane's tender offer drew near, Harsco determined that stockholders had tendered fewer than 50,000 shares to Crane, and through consultations determined that arbitrageurs held roughly 400,000 shares. Concerned that these arbitrageurs might tender to Crane, or sell to Crane after the offer expired, Harsco management decided to purchase the stock held by arbitrageurs, if it was offered and proper arrangements could be made.

On February 23, the executive committee of Harsco's board of directors authorized an increase in the number of Harsco shares which management could purchase by 200,000, from 316,000 to 516,000 shares. Harsco had a long-standing policy of treasury stock purchases for use in acquisitions. Around noontime of February 24, Harsco decided that it could legally arrange to purchase up to 500,000 shares from arbitrageurs if it received any unsolicited offers. Shortly afterward, at about 2:00 P.M., Harsco began receiving calls from arbitrageurs who were told that Harsco was interested, but would first have to make the formal arrangements. On February 25, Harsco and an arbitrageur engaged in negotiations concerning the price, amount and means of trading a block of stock composed of his holdings and those of three other arbitrageurs. Agreement on a price of $43 per share was reached sometime after 9:00 A.M., but arrangements to trade the stock on the Pacific Exchange were not completed until mid-afternoon, and the trade was first made at 4:03 Eastern Standard Time ("EST"). Between 10:00 and 4:00 EST, Harsco filed with the Securities Exchange Commission ("SEC") a Rule 13e–1 Transaction Statement, an amendment thereto, and an amendment to its Schedule 14D–9. It also commenced mailing the Rule 13e–1 Statement to its stockholders. The Rule 13e–1 Statement and Schedule 14D–9 amendment stated, in relevant part:

(1).... Professional traders (commonly referred to as arbitrageurs) have contacted the Company to express their willingness to sell their Shares to the Company. To date the Company has not accepted any such proposals; however, if offers from professional traders are received hereafter, the Company may consider them, and, if the terms and conditions of such offers are satisfactory to the Company, the Company may purchase such Shares. In no event will the Company accept offers which would result in the acquisition of an aggregate of more than 500,000 Shares. All such purchases will be privately negotiated transactions. There can be no assurances that any such purchases will in fact be made.

The Rule 13e–1 Statement continued as follows:

(2) Any Shares thus acquired will be held in the treasury of the Company and will be used for general corporate purposes; including without limitation use in the future acquisition of other companies and possible use in the Thrift Plan and in the Dividend Reinvestment Plan. Any acquisition of Shares will also have the effect of preventing Crane Co. from purchasing those Shares.

(3) The funds for stock purchases will be delivered from cash and short-term investments held by the Company.

The amendment to the Rule 13e–1 Statement filed that day stated that "the purchases referred to in paragraph (1) thereof may require use of the facilities of a national securities exchange on which the Common Stock of the Company may be traded." Dkt. 81 at Ex. D and E.

On February 26, at the request of the New York Stock Exchange, Harsco issued a press release describing the transaction. Trading in Harsco stock did not open that day. That same day Crane filed its second amended complaint against Harsco, and moved for a temporary restraining order and preliminary and permanent injunctive relief. Crane alleged that Harsco's intended purchase would violate §§ 9(a), 10(b), 13(e), and 14(e) of the Securities Exchange Act of 1934, SEC Rules 13e–1, 13e–4, and 14d–9, and would constitute a waste of corporate assets and a breach of fiduciary duty under Delaware common law.

This Court has jurisdiction over the securities law claims under § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. The Court has jurisdiction over the Delaware common law count as a pendent claim. *See, e. g., UMW v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Panter. v. Marshall Field & Co.,* 486 F.Supp. 1168, 1192 (N.D.Ill. 1980).

## II. *Legal Questions*

In order to grant a preliminary injunction, the Court must determine that Crane has a reasonable likelihood of success on the merits, and would be irreparably injured absent such relief; the Court must also consider whether other parties would be substantially harmed and whether the public interest would be served. *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515 (3d Cir. 1976). With this standard in mind, the Court will examine each of defendant's alleged violations.

### A. *Alleged Securities Law Violations*

#### 1. *Section 13(e) of the Act and SEC Rule 13e–1*

Crane charges that Harsco's purchase of its stock will violate § 13(e)(1) of the Securities Exchange Act, 15 U.S.C. § 78(m)(e)(1) and SEC Rule 13e–1, 17 C.F.R. § 240.13e–1 (1980), promulgated thereunder. Section 13(e)(1) is part of the Williams Act, which was intended to protect investors who are confronted with a tender offer. *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). Section 13(e)(1) specifically prohibits the target company's purchase of its own shares if this would constitute a fraudulent, deceptive, or manipulative practice.[1] Rule 13e–1

---

1. Section 13(e)(1) provides:

It shall be unlawful for an issuer which has a class of equity securities registered pursuant to section 78l of this title, or which is a closed-end investment company registered

under the Investment Company Act of 1940, to purchase any equity security issued by it if such purchase is in contravention of such rules and regulations as the Commission, in the public interest or for the protection of

requires the target to file with the SEC and send or give to its stockholders certain information before purchasing any of its securities during the period of the tender offer.[2] Crane alleges that Harsco has violated § 13(e)(1) and Rule 13e–1 by omitting certain information from its Transaction Statement and by purchasing the stock before the mailed Statement could have reached Harsco stockholders.

### a. Standing

■ Initially the Court must determine whether Crane has standing to raise this cause of action. Though Crane was a stockholder prior to commencement of its tender offer, Crane is not a stockholder to whom a tender offer has been made and thus is not an intended beneficiary of the Williams Act. *Piper v. Chris-Craft Industries, Inc.,* *supra* at 36 n. 23, 97 S.Ct. at 946 n. 23. In *Piper,* the Court refused to find that the tender offeror had an implied cause of action for damages under the Williams Act since such was unnecessary "to ensure the fulfillment of Congress' purpose in adopting

the Williams Act." *Id.* at 41, 97 S.Ct. at 949. However, the Supreme Court held "only that a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages," *id.* at 42 n. 28, 97 S.Ct. at 949 n. 28. Although the Supreme Court has since taken a more stringent approach to the question of implied rights of action, *see Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), these cases, ιike *Piper,* have involved actions for damages rather than injunctive. relief.

The suggestion of dictum in *Piper* that the nature of the requested relief will affect the determination whether a statute creates a cause of action still seems valid. In *Piper,* the Court noted that "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best

investors, may adopt (A) to define acts and practices which are fraudulent, deceptive, or manipulative, and (B) to prescribe means reasonably designed to prevent such acts and practices. Such rules and regulations may require such issuer to provide holders of equity securities of such class with such information relating to the reasons for such purchase, the source of funds, the number of shares to be purchased, the price to be paid for such securities, the method of purchase, and such additional information, as the Commission deems necessary or appropriate in the public interest or for the protection of investors, or which the Commission deems to be material to a determination whether such security should be sold.

2. Rule 13e–1 reads as follows:

When a person other than the issuer makes a tender offer for, or request or invitation for tenders of, any class of equity securities of an issuer subject to section 13(e) of the Act, and such person has filed a statement with the Commission pursuant to § 240.14d–1 and the issuer has received notice thereof, such issuer shall not thereafter, during the period such tender offer, request or invitation continues, purchase any equity securities of which it is the issuer unless it has complied with both of the following conditions:

(a) The issuer has filed with the Commission eight copies of a statement containing

the information specified below with respect to the proposed purchases:

(1) The title and amount of securities to be purchased, the names of the persons or classes of persons from whom, and the market in which, the securities are to be purchased, including the name of any exchange on which the purchase is to be made;

(2) The purpose for which the purchase is to be made and whether the securities are to be retired, held in the treasury of the issuer or otherwise disposed of, indicating such disposition; and

(3) The source and amount of funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading the securities, a description of the transaction and the names of the parties thereto; and

(b) The issuer has at any time within the past 6 months sent or given to its equity security holders the substance of the information contained in the statement required by paragraph (a) of this section: *Provided, however,* That any issuer making such purchases which commenced prior to July 30, 1968 shall, if such purchases continue after such date, comply with the provisions of this rule on or before August 12, 1968. (Emphasis in original).

be given.' ", *id.* at 42, 97 S.Ct. at 949, *quoting from Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 942 (2d Cir. 1969), and added that damage awards to parties other than the protected class of shareholders would not serve to insure disclosure and might even impede attractive tender offers. Most significantly, the Court reserved judgment on the question whether an offeror has standing to seek injunctive relief. 430 U.S. at 47 n. 33, 97 S.Ct. at 952 n. 33.

■ This Court must determine then whether an offeror has a private right of action for injunctive relief under § 13(e)(1) of the Act. The determination "whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction," *Transamerica Mortgage Advisors, Inc., supra* 444 U.S. at 15, 100 S.Ct. at 245. In construing a statute, evidence of the purpose of the statute is part of the information which must be evaluated. Purpose, as well as the language and focus of the statute and its legislative history, is "traditionally relied upon in determining legislative intent." *Touche Ross & Co. v. Redington, supra* 442 U.S. at 576, 99 S.Ct. at 2489. In *Piper,* the Court concluded that "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer," *id.* 430 U.S. at 35, 97 S.Ct. at 946. The Williams Act contains no express remedy to facilitate this purpose; the purpose suggests, however, that an implied private right of action for injunctive relief was intended.

■ Before concluding that Congress intended to imply a remedy, this Court "must carefully analyze the four factors that *Cort* [*v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)] identifies as indicative of such an intent." *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). First, the Court must determine whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted....' " 422 U.S. at 78, 95 S.Ct. at 2087 (Emphasis in original). Al-

though Crane, as the offeror, was not an intended beneficiary, Crane is the only party likely to possess timely knowledge of misrepresentations and thus the practical opportunity to enforce this facet of the scheme of the Williams Act to protect the shareholders, the class of intended beneficiaries. *See Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* 451 F.Supp. 468, 476 (E.D.Pa.1978); *Applied Digital Data Systems v. Milgo Electronic,* 425 F.Supp. 1145, 1152 (S.D.N.Y.1977); *Humana, Inc. v. American Medicorp, Inc.,* 445 F.Supp. 613, 615 (S.D.N.Y.1977). Crane itself would not directly benefit from injunctive relief; rather, the shareholders would be protected from management's manipulative or fraudulent actions which would otherwise nullify the informational advantages granted by the Act. In fact, as has been noted with regard to § 14(e) of the Act, "to disallow the use of the injunctive remedy solely because its use is urged by the tender offeror would apparently conflict with the Williams Act's interest in protecting investors." *Weeks Dredging & Contracting, Inc. v. American Dredging Co., id.*

The second *Cort* factor is whether there was "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." 422 U.S. at 78, 95 S.Ct. at 2088. Although the legislative history contains no explicit indication of an intent to create or deny a private injunctive remedy, the purpose of the Williams Act again suggests an answer. The Williams Act attempts to protect investors by requiring disclosure of information to shareholders within a time frame which will allow them to evaluate the offer in light of the information. If a tender offer is thwarted by wrongful action on the part of the target, damage actions by shareholders under § 18 of the Act, 15 U.S.C. § 78r(a), would hardly serve as a remedy since only shareholders who purchased or sold in reliance upon a false or misleading statement could sue. Thus, § 18 would not recreate the former possibly advantageous tender offer for those shareholders who were dissuaded

from tendering by misleading information.[3] Nor can injunctive action by the SEC under § 21 of the Act, 15 U.S.C. § 78u, be relied upon to effect the purpose of the Williams Act, dependent as the purpose is upon immediate enforcement of the disclosure requirements.

Third, under *Cort*, the Court must ascertain whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." 422 U.S. at 78, 95 S.Ct. at 2088. On the basis of the preceding discussion, the answer is obvious. A private injunctive remedy will insure that target management does not engage in manipulative or fraudulent behavior to the disadvantage of its shareholders, or at least will allow "investors to arrive at their decisions in an environment purged of false and misleading information." *Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* *supra* at 476. Moreover, this remedy will not prove valuable to offerors as a delaying tactic given the stringency of the standard for injunctive relief.

Fourth, *Cort* requires that the Court decide whether "the cause of action [is] one traditionally relegated to state law...." 422 U.S. at 78, 95 S.Ct. at 2088. The Court is aware of no state law right to sue for disclosures as required under federal law. An implied private right of action for injunctive relief under § 13(e)(1) will not overlap or interfere with state corporate law. *Cf., Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (Rule 10b–5).

The Court does not find persuasive recent decisions in other jurisdictions holding that there is no implied injunctive remedy under § 13(d) of the Act, as these cases ignore the distinction between injunctive relief and damages in their analyses. *See, e. g., Gateway Industries, Inc. v. Agency Rent A Car, Inc.,* 495 F.Supp. 92 (N.D.Ill.1980), and *Sta-Rite Industries, Inc. v. Nortek, Inc.,* 494 F.Supp. 358 (E.D.Wis.1980). The Court holds that § 13(e)(1) of the Williams Act, in which timing is a critical element of the regulatory scheme, implies a private right of action for injunctive relief; therefore, Crane has standing to bring this action.

b. *The Merits of the Claim*

■ First, Crane argues that Harsco violated §. 13(e)(1) and Rule 13e–1 by filing with the SEC and sending to its stockholders a Transaction Statement which was materially false and misleading. Crane alleges that Harsco misrepresented its "active course of communications and dealings with arbitrageurs" by stating that arbitrageurs had contacted Harsco to express their willingness to sell their shares. Though Harsco pursued a carefully-planned course of conduct in its dealings with arbitrageurs, its Statement is consistent with its efforts to purchase stock that they held without encouraging them to purchase more stock for the purpose of sale to Harsco. Whatever obscurity exists in Harsco's characterization of its actions does not rise to the level of falsity or misrepresentation. Further, prior to consummation of the purchase, this Statement was an adequate summary of Harsco's plans, and Rule 13e–1 requires no more definite disclosure.

■ Crane next asserts that the Statement failed to disclose the purpose of Harsco's prospective purchases: to defeat the Crane tender offer. Though the Statement does not set forth Harsco's purpose in as straightforward a manner as plaintiff desires, the reasonable reading of the stated purpose is that Harsco seeks to prevent Crane's purchase of the shares. The reference to general corporate purposes is only an explanation of possible future use of the shares.

■ Finally, Crane alleges that Harsco failed to disclose both the premium it intended to pay to arbitrageurs and its overall plan to buy only stock held by arbitrageurs prior to February 26, 1981. Inasmuch as such information is not required by Rule 13e–1, Crane urges these instances of nondisclosures, along with those above, as the

---

**3.** An implied private injunctive remedy under § 13(e) is not excluded by the existence of an express remedy in § 18, since § 18 provides only for actions for damages.

basis for its claim that Harsco has attempted to deceive and manipulate the market in violation of § 13(e)(1). However, Crane offered no evidence of any intent to manipulate, nor is there any indication that any manipulation has occurred. Further, Crane argues that Harsco's plan will keep the market price artificially high because arbitrageurs will not know that Harsco only intends to purchase stock held as of February 26, yet admits that Harsco made this fact known to arbitrageurs with whom it communicated. Thus, neither Crane's claim of material nondisclosures nor its claim of manipulation is likely to succeed on the merits.

■ Second, Crane charges that Harsco violated § 13(e)(1) and Rule 13e–1 by not disseminating its Statement to its shareholders at a time which would have insured their receipt of the Statement prior to the purchase. Theoretically, stockholders would then not have been misled by any changes in the market that might have followed. Such is not required on the face of the Rule. Nor need the Court decide whether the purpose set forth in § 13(e)(1) would require such compliance since Crane has failed to establish irreparable harm. Even if Harsco violated this section of the Williams Act, an injunction would not issue absent a showing of irreparable harm. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Whatever harm stockholders might have suffered as a result of not having the Statement has been remedied, given that no trading occurred on February 26 and that a temporary restraining order granted that same day prevented any purchase by Harsco prior to the hearing on the motion for a preliminary injunction. In the intervening five days, shareholders should have received the Statement and had the benefit of that information.

### 2. § 13(e) of the Act and SEC Rule 13e–4

■ Rule 13e–4, 17 C.F.R. § 240.13e–4 (1980), promulgated by the SEC under § 13(e), governs the making of a tender offer by the issuer for its own securities, by requiring disclosures and procedures similar to those imposed by § 14(d) and Rule 14d–1 on third party tender offers. Crane claims that Harsco's actions in purchasing its own stock constitute a tender offer and that Harsco's failure to comply with Rule 13e–4 requires injunctive relief. Although § 13(e) contains no express private right of action, the same considerations which compelled a finding of an implied private right of action for injunctive relief in the preceding section apply here as well. Therefore, the Court holds that Crane as an offeror has standing to seek injunctive relief on behalf of Harsco shareholders, from Harsco's alleged violation of Rule 13e–4.

■ Since Harsco concedes that it has not complied with Rule 13e–4, the only question is whether Harsco's actions constitute a tender offer. Although the Williams Act regulates tender offer activity, the term tender offer has never been defined by statute. Faced with a variety of stock purchase attempts, courts have enumerated a number of factors which characterize and, in effect, define a tender offer: a corporation's active and widespread soliciting of its own shares, soliciting for a substantial number of shares, stating a firm offer as to the terms for purchasing a minimum amount of shares, making offers contingent on tender of a minimum fixed number of shares, limiting the period of time during which offer will be open, engaging in significant publicity regarding the purchase, subjecting the shareholders or sellers to pressure to sell, and paying a premium above market price for shares purchased. *Wellman v. Dickinson*, 475 F.Supp. 783, 823–826 (S.D.N.Y. 1979); *Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. 773, 789–792 (S.D.N.Y.1979); *Financial General Bankshares, Inc. v. Lance*, [1978] *Fed.Sec.L.Rep.* (CCH) ¶ 96,403 (D.D.C.1978).

These factors are not of equal significance; courts have emphasized that pressure on stockholders to decide whether to sell is the primary characteristic of a tender offer. *Gilbert v. Bagley*, 492 F.Supp. 714 (M.D.N.C.1980); *Stromfeld v. Great Atlan-*

tic & Pacific Tea Co., 496 F.Supp. 1084 (S.D.N.Y.1980); *Chromalloy American Corp. v. Sun Chemical Corp.*, 474 F.Supp. 1341 (E.D.Mo.), *aff'd*, 611 F.2d 240 (8th Cir. 1979); *Panter v. Marshall Field & Company*, 486 F.Supp. 1168 (N.D.Ill.1980); *S–G Securities, Inc. v. The Fuqua Investment Co.*, 466 F.Supp. 1114 (D.Mass.1978); *Nachman Corp. v. Halfred, Inc.* [1973–74] *Fed. Sec.L.Rep.* (CCH) ¶ 94,455 (N.D.Ill.1973); *Cattlemen's Investment Company v. Fears*, 343 F.Supp. 1248 (W.D.Okl.1972), *vacated per stipulation*, Civil Action No. 72–152 (W.D.Okl., May 8, 1972), *dismissed* (W.D. Okl., February 12, 1973).

Crane asserts that Harsco's communications with arbitrageurs constituted active solicitation of its shares with the promise of a premium above market price and was accompanied by widespread publicity. Crane argues that by purchasing shares from arbitrageurs Harsco will acquire shares bought from shareholders by arbitrageurs, and thus is making a tender offer to its shareholders through "the instrumentality of the arbitrage community." Crane Brief at 40. However, Harsco limited itself to the purchase of shares acquired by arbitrageurs prior to February 26, 1981. Not only did Harsco never intend to exert any pressure on stockholders, it sought to avoid instigating purchases by arbitrageurs. A willingness to negotiate does not amount to solicitation. Even if impact rather than intent is determinative, Harsco's willingness to buy from arbitrageurs and the pre-February 26 purchase requirement received similar "publicity." In any case, evidence offered by Crane that some portion of the 132,300 share block was purchased by the arbitrageurs after Harsco had decided to purchase its own shares hardly establishes that arbitrageurs began to exert pressure on stockholders to sell.

As for the other factors indicating a tender offer, first, Harsco was diligent in its efforts to avoid publicity and keep the transactions private. The trade on the Pacific Exchange was arranged so that Harsco would not have to buy up stock listed in a specialist's "book" at lower prices, an action which would more closely have resembled a solicitation. Second, Harsco publicized its offer only to the extent required by law, and its press release on February 26 was required by the New York Stock Exchange. Neither the Transaction Statement nor the press release suggested that Harsco wished to buy stock then in the hands of its stockholders. Third, even if Harsco's actions were deemed a solicitation for substantially all the Harsco stock traded since Crane's offer, less than 5% of Harsco stock, it still would not be a solicitation for a substantial number of shares since the term "substantial" requires reference to the total number of Harsco shares. *See, e. g., Brascan Ltd. v. Edper Equities Ltd., supra; Financial General Bankshares, Inc. v. Lance, supra.* Fourth, the only characteristic of a tender offer which Harsco's actions exhibit is the payment of an above-market premium. Standing alone, payment of a premium does not a tender offer make. *Financial General Bankshares, Inc. v. Lance, supra.*

### 3. Sections 9(a), 10(b), and 14(e) of the Securities Exchange Act and SEC Rule 14d–9

In its second amended complaint, Crane also asserts violations of §§ 9(a), 10(b), and 14(e) of the Act. However, Crane has apparently relinquished these claims as no arguments as to §§ 9(a), 10(b) and 14(e) were presented in its brief or at the hearing. Therefore, the Court does not consider these claims to be before it on this motion. Crane similarly waived consideration of its claim under Rule 14d–9, 17 C.F.R. § 240.-14d–9 (1980).

### B. Alleged Delaware Common Law Violation

Finally, Crane alleges that Harsco's management breached its fiduciary duty under Delaware law by purchasing Harsco shares in order to perpetuate its control. Before reaching the merits, the Court must first determine whether this claim is properly before it.

### 1. Derivative Nature of the Action

Harsco contends that a claim of this kind can be raised only in a derivative action, though it cites no Delaware authorities for

that proposition. While that is the rule as to actions for damages, *see* 13 Fletcher, *Cyc. Corps.* § 5921, it is not generally the case where injunctive relief is sought. *See id.* § 5915.1 (stockholders may sue individually to enjoin threatened misapplication of corporate assets). Though the line of distinction between injuries giving rise to derivative as opposed to individual actions is "often a narrow one," *Abelow v. Symonds,* 38 Del.Ch. 572, 156 A.2d 416, 420 (1959), Delaware courts have not drawn it on the basis of the nature of the relief sought. *Compare Elster v. American Airlines, Inc.,* 34 Del.Ch. 94, 100 A.2d 219, 222–223 (1953) (injunctive relief) *with Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970) (damages).

■■■■ Under Delaware law, an individual action may be brought in cases "in which there is injury to the corporation and also special injury to the individual stockholder," for example, "a wrong affecting any particular right which he is asserting—such as his pre-emptive rights as a stockholder, rights involving the control of the corporation . . . ." *Elster v. American Airlines, Inc.,* 34 Del.Ch. 94, 100 A.2d 219, 222 (1953). Crane suggests that it has suffered "special injury" in that Harsco is allegedly attempting to frustrate its right to acquire additional shares by means of a tender offer. *See* Second Amended Complaint ¶ 90. However, the "right" to make a tender offer is not a contractual right owed to the shareholder by the corporation. By contrast, denial of the right to voting control is an example of a contractual right, denial of which by the corporation gives rise to an individual cause of action. *See, e. g., Condec Corp. v. Lunkenheimer Co.,* 43 Del.Ch. 353, 230 A.2d 769 (1967) (issue of new stock deprived successful offeror of apparent majority and thus of control). In the instant case, Harsco owed no specific contractual duty to Crane, and although Crane suffered an injury distinct from that of other stockholders, that is not a sufficient basis for an individual action under Delaware law.

Having decided that Crane must bring a derivative action on the breach of fiduciary duty claim, the Court must next determine whether Crane's amended complaint states a derivative cause of action. Though the Delaware common law count, Count VIII of the complaint, is not denominated a derivative claim, that is not dispositive of the question; the nature of the action is to be determined from the body of the complaint. *See* 13 Fletcher, *Cyc. Corps.* § 5912. *Cf. Reeves v. Transport Data Communications, Inc.,* 318 A.2d 147, 150 (Del.Ch.1974) (court will look behind assertion that suit is derivative). As the Court stated in *Reeves,* "[a] derivative action is in reality one brought by a stockholder on behalf of the corporation, not to redress a wrong done to him individually, but to obtain recovery or relief in favor of the corporation and all similar stockholders so as to compensate the corporation for some wrong done to it as a whole." *Id.* at 149.

In its complaint, Crane alleges that Harsco's "solicitation of and agreements with professional traders and arbitrageurs is a waste and spoilation [sic] of Harsco's assets and a breach of the fiduciary duty owed by the directors of Harsco to Harsco and its shareholders (including Crane) motivated solely by the desire of the Harsco directors to defeat or to otherwise render unsuccessful the pending tender offer by Crane." Second Amended Complaint ¶ 90. The suit seeks a preliminary injunction to prevent Harsco from settling its purchase of the 132,300 shares, and from purchasing any additional shares during the pendency of the suit. Thus, the harm alleged and the relief sought both concern stockholders generally; the gravamen of the count is derivative.

■■■■ In the Court's view, the complaint complied adequately with the requirements set out in the Federal Rules of Civil Procedure for derivative actions. Rule 23.1 requires that the complaint be verified and that it allege (a) that the plaintiff was a shareholder at the time of the transaction complained of; (b) that the action is not a collusive one to confer jurisdiction on the Court that it would not otherwise have; and (c) the efforts made to persuade the directors to bring the suit. Crane's com-

plaint is verified, and contains the necessary allegation as to (a). It contains no allegations concerning (b) or (c). However, it would be an empty ritual to require an allegation as to absence of collusion where the count is joined to other counts clearly involving federal questions, as is the case here. *Cf.* 3B *Moore's Federal Practice* ¶ 23.1.20 n. 1, at 23.1–99 (2d ed. 1948) (cases holding no allegation required where federal jurisdiction predicated on federal question). Moreover, courts have waived the requirement of a demand upon the directors when it is clear that such a demand would be futile. *See, e. g., Liboff v. Wolfson*, 437 F.2d 121, 122 (5th Cir. 1971) (rule waived where majority of Board approved transaction); *Whittaker v. Brictson Manufacturing Co.*, 43 F.2d 485, 489 (8th Cir. 1930) (directors' interests "antagonistic" to those of plaintiff). Given that the full Executive Committee of the Board approved Harsco's decision to purchase the stock in question, *see* Burdge Dep. (2/28/81) at 325, and that the Board had authorized that measures be taken to resist the tender offer, *see id.* at 334, the Court holds that plaintiff was not required to make a demand. Therefore, the Court holds that plaintiff's complaint adequately complied with the requirements of Rule 23.1.

██ Under the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 53 S.Ct. 817, 82 L.Ed. 1188 (1938), the complaint must comport with the substantive provisions of Delaware law, as well as the procedural provisions of federal law. The only applicable provision of the corporation law is 8 *Del.C.* § 327, which requires that plaintiff be a stockholder at the time of the transaction complained of. Since the complaint so alleges, the complaint is sufficient under state law.

### 2. *Breach of Fiduciary Duty Claim*

██ Turning to the merits, the Court holds that the plaintiff has established a substantial likelihood of success as to the fiduciary duty claim. A corporation has a statutory right to purchase its own shares, *see* 8 *Del.C.* § 160, and under the business

judgment rule, the courts will not interfere with a stock purchase transaction provided the purchase is not for an improper purpose. *See, e. g., Alcott v. Hyman*, 40 Del.Ch. 449, 184 A.2d 90 (1962), *aff'd*, 208 A.2d 501 (Del.1965).

██ It has long been established that, as a general rule, use of corporate funds to perpetuate control of the corporation is improper. *See, e. g., Singer v. Magnavox Co.*, 380 A.2d 969, 979 (Del.1977). Where the stock purchase occurs in the context of a tender offer, the directors have an inherent conflict of interest. *Bennett v. Propp*, 41 Del.Ch. 14, 187 A.2d 405, 409 (1962). In such situations, "the burden should be on the directors to justify such a purchase as one primarily in the corporate interest." *Id.*

Under this rule, Harsco can carry its burden in one of two ways. It can either show that some consideration other than the perceived threat to control was the primary reason for the stock purchase; or it can admit that the stock purchase was intended primarily as a defensive maneuver, and show that the directors reasonably determined that a change in control would constitute "a clear threat to the future business or the existing, successful business policy" of the corporation. *Kaplan v. Goldsamt*, 380 A.2d 556, 569 (Del.Ch.1977); *accord, Cheff v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548, 555 (1964).

██ The Court holds that Harsco failed to carry its burden on this issue. As previously discussed, *see* p. 301, *supra,* Harsco's Rule 13e–1 Transaction Statement itself indicates that the primary purpose of the stock purchase was to frustrate the tender offer. The conclusion that the purchase was primarily a defensive maneuver is amply supported by the record. When asked why Harsco made the purchase, Harsco's Financial Vice President, Mr. Rezich, testified, "Well, I would think that the—one of the big reasons would be to make those shares not available to Crane & Company." Rezich Dep. (2/28/81) at 205. Moreover, Harsco had decided in January 1981 to pur-

306

chase its own shares, for acquisition purposes, only when the market price was under $35 a share. *See* Rezich Dep. (2/7/81) at 46. In light of this evidence, and the circumstances surrounding the purchase, the Court finds that the purchase was intended primarily as a defense maneuver.

Turning to the second potential justification of the purchase, the Court finds little evidence to support any suggestion that the tender offer threatened either Harsco's business success or its future. This Court, in an earlier opinion, dismissed Harsco's contention that Crane would harm a Harsco subsidiary through misuse of proprietary information. *See* Opinion of February 17, 1981, at 24–26. Harsco has made no showing that Crane would be likely to impose business methods that are fundamentally incompatible with Harsco's, *see Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136, 141 (1960), nor that there is any threat of liquidation by Crane, *see Cheff v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548, 555 (1964). On this record, the Court holds that Harsco has not carried the burden of showing that the stock purchase was primarily in the interest of the corporation, even if it is assumed that Crane would obtain control of Harsco if its tender offer were successful. Therefore, Crane has established a substantial likelihood of success on the merits of its fiduciary duty claim.

In order to justify preliminary injunctive relief on this claim, however, Crane must also show that irreparable injury is likely to result from denial of such relief. *See* p. 298 *supra*. Crane did not suggest, and the Court is unable to see, what irreparable harm would result from not granting an injunction if the stock purchase only violates the law concerning fiduciary duty. Crane has not shown how allowing Harsco to complete its purchase would affect Crane's tender offer, except with regard to the shares directly involved, which the arbitrageurs might otherwise have tendered to Crane. In the event that Crane succeeds on this claim in a trial on the merits, the Court could order Harsco to sell the stock, either to Crane at a fixed price, or on the market. Absent a showing of irreparable injury, in addition to the showing of likelihood of success on the merits, the Court cannot grant injunctive relief. *See A.L.K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761, 764 (3d Cir. 1971). Therefore, no preliminary relief will be granted as to the Delaware common law claim.

### III. *Conclusion*

For the reasons stated above, the Court holds that Crane has failed to establish a reasonable probability of success on the merits of its claims as to SEC Rule 13e–4, and as to one of its claims under 13e–1. Crane has also not shown the likelihood of irreparable injury as to its claims under Delaware common law, and the remaining claim under Rule 13e–1. Preliminary injunctive relief is therefore denied.

### ON MOTION FOR REARGUMENT

Harsco Corporation has moved for reargument on Crane Company's motion for a preliminary injunction. This Court denied the motion for injunctive relief in its Order of March 4, 1981. In its opinion supporting that Order, the Court held, *inter alia*, that Crane's claim that Harsco had breached its fiduciary duty could be raised only in a derivative action. The Court determined that the complaint stated a derivative claim in Count VIII, despite the fact that the claim was not denominated as such. Opinion of March 12, 1981 at 303–305. The Court further held, on the basis of the evidence in the record, that there was a substantial likelihood that Crane would succeed on the merits of the fiduciary duty claim. *Id.* at 305–306. However, the Court held that Crane had not made an adequate showing as to irreparable injury, and therefore denied Crane's motion for a preliminary injunction. *Id.* at 306.

In its motion for reargument, Harsco brings to the Court's attention a part of the record not previously cited by the parties. Though the fiduciary duty claim was stated in the complaint, briefed by one of the parties, and addressed by the other party at oral argument and in a subsequent letter memorandum to the Court, neither party

addressed the issue whether Crane's complaint stated a derivative cause of action. Harsco now cites a statement in the record by one of Crane's attorneys made in the course of defending a deposition, to the effect that the corporate waste allegations in the complaint were not intended to state a derivative claim. Hundt Dep. (3/1/81) at 170. At oral argument, Crane conceded that no derivative claim was intended.

In light of the fact that Crane takes the position that there is no derivative issue in the case, the Court will not find a derivative claim where the plaintiff did not intend one. The Court therefore revises its Opinion to hold that Crane's complaint did not state a derivative claim.

Harsco contends in addition that the Court should not have reached the merits as to the fiduciary duty claim. The Court sees no purpose in amending the portion of the Opinion in which it found that Crane was likely to succeed on that claim. Given the Court's holdings as to irreparable injury and the nonderivative nature of the claim, the Court's discussion of the merits is clearly dictum. Moreover, the Court's finding of probable success on the merits was premised on the facts in the record at the time of the Court's ruling. Therefore, it gives no definitive indication of the Court's ruling on this claim at the trial on the merits, or in a different factual setting.

Insofar as none of the matters raised by Harsco "might reasonably have altered the result reached by the Court," *United States v. International Business Machines Corp.,* 79 F.R.D. 412, 414 (S.D.N.Y.1978), the motion for reargument is denied.